UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DONNA ROSEANN CARDER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 4:17 CV 2410 (JMB) |
| ) | |
| NANCY A. BERRYHILL, ) | |
| Deputy Commissioner of Operations, ) | |
| Social Security Administration, ) | |
| ) | |
| Defendant. ) | |

### **MEMORANDUM AND ORDER**

This matter is before the Court for review of an adverse ruling by the Social Security Administration. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

### **I. Procedural History**

On March 27, 2014, plaintiff Donna Roseann Carder protectively filed an application for supplemental security income, Title XVI, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of September 27, 2013. (Tr. 171-76). After plaintiff's application for benefits was denied on initial consideration (Tr. 87-97), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 109-11).

Plaintiff and counsel appeared for a hearing on March 17, 2016. (Tr. 34-82). Plaintiff testified concerning her disability, daily activities, functional limitations, and past work. The ALJ also received testimony from vocational expert Cathy M. Hodgson, Ed.D. The ALJ issued a decision denying plaintiff's application on June 22, 2016. (Tr. 31-31). The Appeals Council

denied plaintiff's request for review on July 17, 2017. (Tr. 1-4). Accordingly, the ALJ's decision stands as the Commissioner's final decision.

## II. Evidence Before the ALJ

### A. Disability and Function Reports and Hearing Testimony

Plaintiff was born on August 21, 1991, and was 22 years old when she filed the application. She completed the twelfth grade with special education services. (Tr. 187). At the time of the hearing in March 2016, she had lived with an aunt and uncle for just over a year. She testified that she left her mother's home because she was subjected to physical and sexual abuse since she was three years old. (Tr. 45-46, 71).

Plaintiff listed her impairments as ADHD, depression, bipolar disorder, comprehension issues, and illiteracy. (Tr. 186). In 2016, plaintiff was prescribed medications for the treatment of irritable bowel syndrome, acid reflux, depression, anxiety, bipolar disorder, an irregular menstrual cycle, and asthma. (Tr. 228, 714).

The record contains a function report that plaintiff completed in April 2014 with the help of her mother, Donna Carder, who also completed a third-party function report.[1] (Tr. 207-17; 192-99). Plaintiff's daily activities included dressing, feeding the family pets, and eating. Plaintiff did not prepare meals but, with her mother's close supervision, was able to help with laundry, dish washing, and cleaning. Plaintiff stated that she was unable to do more because she could not stay on her feet and fell "a lot." (Tr. 210). She was only able to walk for 10 to 50 feet before she needed to take a break for 25 to 30 minutes. She could pay attention for between 15 and 30 minutes and needed reminders to attend to her grooming. She could not comprehend

---

[1] The two reports are substantively identical. Plaintiff testified that her mother completed the paperwork in order to get money rather than out of any desire to get help for plaintiff. (Tr. 44). The ALJ gave little weight to the third-party report. (Tr. 25).

either written or spoken instructions. Plaintiff was not able to count change, pay bills or handle financial accounts. She did not drive because she was afraid to get her driver's license and she did not go out alone because she became confused easily. She did not go anywhere except to visit her grandmother. She got along well with others. She did not handle stress or changes in routine well. Plaintiff had difficulties with walking, sitting, memory, completing tasks, concentrating, understanding, and following instructions. The Field Office interviewer spoke with plaintiff by telephone and reported that she had to ask her mother the correct address. (Tr. 183).

    Plaintiff weighed 238 pounds at the time of the hearing, which she testified represented a gain of at least 100 pounds in the year since she had come to live with her aunt and uncle.[2] She testified that her mother would not feed her when she lived with her. (Tr. 49). When asked about her ability to walk, plaintiff stated that her ankle "gave out." She thought she could walk about 10 to 15 minutes before she had to stop, due to pain in her ankle and leg. (Tr. 49-50). Plaintiff testified that she also had severe headaches during which she had to lie down in the dark. (Tr. 55). She treated these headaches with 800 milligrams of ibuprofen.[3] (Tr. 56-57). Plaintiff testified that she used two inhalers on a daily basis to treat cystic fibrosis.[4] (Tr. 47). In addition, plaintiff had sustained damage to her pelvic floor which caused urinary incontinence. Her insurance would not pay for the recommended therapy so she was prescribed exercises to

---

[2] Between June 2010 and July 2015, plaintiff's weight fluctuated slightly around 180 pounds. Thereafter, her weight steadily increased to 238 pounds.

[3] Plaintiff initially testified that she had headaches two or three times a week and that they lasted for two or three days. Under questioning from her attorney, she acknowledged that her testimony implied that she had headaches every day of the week, which was not accurate. She amended her testimony to state that she had three or four headaches each month, each lasting more than one day. (Tr. 55-56).

[4] There is no evidence that plaintiff has cystic fibrosis. She complained of shortness of breath and, in August 2015, imaging studies disclosed a benign granuloma in one lung. (Tr. 872).

strengthen her pelvic floor. Nonetheless, she was frequently incontinent. In addition, the medication that she took to treat irritable bowel syndrome caused diarrhea. She testified that she needed to use the restroom every 30 minutes. (Tr. 48, 53-54).

Plaintiff testified that she suffered from anxiety when she was around other people. (Tr. 58-59). She had panic attacks about three times a week and was fearful around men. (Tr. 59-61). She also suffered from depression, which had been more severe before she started treatment, but she still had crying spells. (Tr. 61-62). She had also been diagnosed with bipolar disorder and had occasional manic periods during which she became "hyper." (Tr. 62-63). Her memory was poor and she needed reminders to take her medications. (Tr. 63-64). She had difficulty paying attention and was frequently distracted by the need to use the restroom and her anxieties. She thought she could focus for ten minutes to an hour. (Tr. 65-66).

Plaintiff's sleep was typically interrupted by flashbacks and nightmares and the need to use the bathroom. As a result, she needed to lie down two or three times every day. (Tr. 67-68). She spent the rest of her time watching television or reading children's books. She was able to wash dishes and cook simple foods. (Tr. 68-69). She testified that she would not be able to do chores for an 8-hour day, five days a week, due to shortness of breath, ankle pain, bathroom breaks, panic episodes, and mood changes. (Tr. 69-70).

Vocational expert Cathy Hodgson was asked to testify about the employment opportunities for a hypothetical person of plaintiff's age, education, and work experience who was able to perform light work and who was limited to performing simple, routine work in an environment that was isolated from the public and required only occasional interaction with coworkers and supervisors, and no more than simple math and reading skills. (Tr. 78). According to Dr. Hodgson, such an individual would be able to perform work that was available

in the national economy such as garment sorter or bakery line worker. (Tr. 77-78). The same individual would require work accommodations if she also required redirection by a supervisor every hour or needed two breaks in addition to normal midmorning, midafternoon, and lunch breaks. (Tr. 79). An individual who was absent from work two or more times a month would be unable to perform any work in the national economy. (Tr. 79). In response to questions from plaintiff's counsel, Dr. Hodgson testified that there was no unskilled work available for an individual who required the presence of a family member or to work in complete isolation from others. (Tr. 80-81).

B. **Educational and Medical Evidence**

1. **Educational Records**

When she was five years old, plaintiff was assessed with language disorders and delays in adaptive behaviors. (Tr. 599-606). Cognitive assessments completed in February 2000 placed plaintiff within the borderline level of intellectual functioning.[5] (Tr. 291). She received special education services throughout her schooling for weaknesses in math, reading, written expression, speech, and social skills. (See, e.g., Tr. 270-75, 293-95, 341-43).

On April 11, 2003, school officials noted that plaintiff had repeated instances of disruptive behavior. When placement in an alternative school and suspension did not have the desired effect, plaintiff was placed on "homebound status." (Tr. 608). And, on April 24, 2003, she was admitted to Lakeland Hospital. The principal of plaintiff's school informed Lakeland Hospital that plaintiff was diagnosed with emotional disturbance and displayed poor attention to tasks and poor compliance with rules. Her interactions with peers, especially boys, were very

---

[5] In October 2000, plaintiff's mother sought an order of child protection against plaintiff's father on the basis of physical, sexual, and emotional abuse. (Tr. 631-33).

inappropriate. (Tr. 307). In 2006, the Ozark Medical Center determined that plaintiff displayed symptoms of posttraumatic stress disorder (PTSD) and bipolar disorder. (Tr. 522-26). She was prescribed medication for bipolar disorder. (Tr. 335).

When plaintiff was in the 11th grade, she was evaluated for concerns regarding cognition, adaptive behavior, social-emotional behavior, vocational transition, and academic achievement. (Tr. 516). It was noted that plaintiff was able to complete assigned tasks and work independently, but she had difficulties interacting appropriately with adults and her peers, considering consequences before acting, and taking responsibility for her behaviors. (Tr. 516-17). A test of her cognitive function again placed her in the borderline range. The tester noted that plaintiff displayed a positive attitude and cooperated throughout the testing, but had a tendency to give up easily. (Tr. 518-19). It was also noted that her emotional disturbance and mood changes interfered with her ability to learn and complete school work and form interpersonal relationships with peers and teachers. (Tr. 526).

### 2. Medical Records

#### a. Treatment for Physical Conditions

Plaintiff sought treatment in June 2010 for chest pain, shortness of breath, irregular menses and weight gain. (Tr. 721-24). She also complained of urinary frequency, poor sleep, and episodes of double vision. An EKG was within normal limits. There is no record of further medical care until the summer of 2013, when she sought treatment for knee pain. (Tr. 716, 726-28, 715). She continued to complain of knee pain in 2014, although no weakness, instability or altered gait were noted on examination. (Tr. 752-55).

In February 2015, plaintiff's gallbladder was removed. (Tr. 1076-79). On March 17, 2015, she presented to the emergency room with complaints of abdominal pain and painful

urination. (Tr. 1070-75). In March and April 2015, plaintiff began treatment with specialists for treatment of abdominal pain and pressure, chronic constipation, symptoms of vaginal bulge, and urinary incontinence.[6] (Tr. 864-69, 860-63, 761-64, 848-53). These symptoms were thought to be related to plaintiff's history of extensive sexual and physical abuse. (Tr. 867). A pelvic sonogram was unremarkable and a colonoscopy was normal with the exception of nonbleeding internal hemorrhoids. (Tr. 881, 1060). A physical examination disclosed severe pelvic floor muscular atrophy and bilateral levator ani spasm attributed to nerve damage. (Tr. 764-65, 820). It was recommended that she undergo pelvic floor therapy to address her urinary incontinence and pelvic pain, but she was unable to find a provider who accepted her insurance. (See Tr. 843, 789).

In May 2015, plaintiff reported that her constipation was much improved with medication. (Tr. 845). In July 2015, it was determined that plaintiff had a follicular ovarian cyst. (Tr. 874). A CT scan of the abdomen and pelvis completed in August 2015 disclosed a benign granuloma in plaintiff's left lung and diffuse fatty infiltration of her liver. (Tr. 872). A consultant opined that plaintiff's abdominal pain was out of proportion to her presentation and recommended that she receive psychotherapy. (Tr. 806-08). In November 2015, plaintiff continued to complain of chronic pelvic pain. (Tr. 792-94). At that time, she denied urinary incontinence and constipation. On examination, she was found to have Grade 1 uterine prolapse. Also in November 2015, plaintiff was diagnosed with GERD, for which she was prescribed medication. She was also referred for a pulmonary function test to evaluate shortness of breath and wheezing. (Tr. 783-84).

---

[6] Plaintiff reported that she was voiding every 30 minutes. (Tr. 762).

Throughout the period under consideration, plaintiff also sought treatment for headaches, racing heart, nausea, dizziness, and syncope. (Tr. 841-47). Physician Emily K. Masterson, M.D., thought that many of plaintiff's symptoms were due to panic attacks, but referred her to a neurologist for evaluation of daily headaches and syncope. (Tr. 845). Imaging studies of the brain were unremarkable. (Tr. 871, 1047). Neurologist Mignon M. Makos, M.D., opined that the episodes of syncope were not likely to be epileptic or life threatening and should improve with treatment of her underlying psychiatric issues. (Tr. 809-13, 801-05, 796-800). Plaintiff was prescribed Topamax for headaches, but it was discontinued because it caused her nausea. (Tr. 826).

As discussed below, plaintiff was hospitalized in November 2015 when she became aggressive and expressed suicidal thoughts. She was stable at discharge on December 1, 2015. On December 2, 2015, Korshie S. Dumor, M.D., became plaintiff's primary care physician. (Tr. 770-76). Dr. Dumor noted plaintiff's history of abuse and psychiatric treatment. Plaintiff reported that she had nightmares and flashbacks but stated that her current dose of Zoloft and Seroquel (prescribed while in the hospital) were effective in controlling her psychiatric symptoms. A physical examination was unremarkable and she presented with normal mood, affect, and behavior. Dr. Dumor listed plaintiff's diagnosis as depressed bipolar disorder and directed her to continue in treatment with Dr. Gowda. In February 2016, plaintiff presented as scheduled with complaints of a sore throat and sinus congestion and to discuss her elevated liver enzymes. Dr. Dumor did not note any abnormalities on examination; nonetheless, he diagnosed plaintiff with strep throat and prescribed antibiotics. (Tr. 777-81).

#### b. Treatment for Psychiatric Conditions

On March 22, 2015, plaintiff went to the emergency room with complaints of anxiety and nightmares. (Tr. 1066-69). She stated that she had not slept in 48 hours. On March 24, 2015, plaintiff was screened for mental health treatment at Pathways Community Health. She reported that she had a history of significant childhood trauma and was suffering from screaming nightmares, flashbacks, frustration, and anxiety. (Tr. 1010-11). She was easily distracted and frustrated and had "major anger." Pathways began providing a variety of services to plaintiff, including psychiatric, counseling, and community support services.[7]

Pathways psychiatrist Bhaskar Gowda, M.D., evaluated plaintiff on April 3, 2015. (Tr. 1006-08). Plaintiff stated that she had been repeatedly molested by her father and others between the ages of four and nine years old. She made three suicide attempts between ages 12 and 14. She received psychiatric treatment for depression and PTSD but could not remember what medications she had been prescribed. Plaintiff reported that she had flashbacks and severe nightmares from which she woke up screaming; her neighbors had called the police. She avoided social contact and found it hard to go out in public. In addition, she felt sad "all the time" and cried frequently. On examination, Dr. Gowda noted that plaintiff was alert, oriented and cooperative, and made good eye contact. She displayed normal speech and had goal-directed thoughts. Her mood and affect were depressed and her intelligence appeared to be below average. Dr. Gowda diagnosed plaintiff with major depressive disorder, recurrent, generalized anxiety disorder, panic disorder with agoraphobia, and PTSD. He assigned a Global

---

[7] Between March 2015 and February 2016, plaintiff had more than 70 service contacts with staff from Pathways, including community support specialists, a counselor, and a psychiatrist.

9

Assessment of Functioning (GAF) score of 40, which denotes major impairment in functioning.[8] Dr. Gowda started plaintiff on Zoloft to treat her depression and Prazosin to treat her nightmares.

Over the next several months, Dr. Gowda made several changes to plaintiff's medications, adding Vistaril for anxiety in May 2015, (Tr. 986-88), Seroquel for mood swings in July 2015, (Tr. 947-49), and a higher dose of Vistaril in August 2015 when plaintiff reported having more panic attacks. (Tr. 929-31). In November 2015, Dr. Gowda added the diagnosis of bipolar disorder, mixed, to plaintiff's profile and decreased the dosage of Zoloft, started Cymbalta, and increased Seroquel, after plaintiff reported that she was feeling helpless and hopeless. (Tr. 897-99). Plaintiff's mental status examinations were unremarkable during these office visits.

On November 26, 2015, plaintiff's aunt and uncle took her to the emergency room, where they completed affidavits stating that plaintiff was very angry and had tried to hurt them. They also produced a suicide note written by plaintiff. (Tr. 1033-35). Plaintiff was extremely distressed at being at the hospital and denied that she was suicidal. She attributed her aggression toward her aunt and uncle to running out of her medications. On examination, she was tearful and distressed, with mild psychomotor agitation. Her flow of thought was perseverative, concrete, and illogical. During the course of a brief admission, plaintiff's symptoms improved. At discharge on December 1, 2015, she was prescribed increased dosages of Zoloft and Seroquel. Her diagnoses were unspecified bipolar disorder and unspecified personality disorder, with a GAF of 45. (Tr. 1036-39).

On January 15, 2016, plaintiff reported to Dr. Gowda that her mood was better. Dr. Gowda decreased her Zoloft while maintaining her other medications. (Tr. 888-90). He

---

[8] Dr. Gowda did not always designate a GAF score for plaintiff, but when he did so, he assigned a GAF of 40. (Tr. 1008, 1003, 987, 948, 930, 912).

modified her diagnoses to bipolar disorder mixed, generalized anxiety disorder, panic disorder with agoraphobia, and PTSD. In February 2016, plaintiff reported that her mood was more even and she was getting along better with her aunt and uncle, with less anger and fewer outbursts. (Tr. 883-85). Dr. Gowda maintained plaintiff's medication regimen. This is Dr. Gowda's last office visit in the medical record.

In addition to Dr. Gowda's medication management, plaintiff met with Pathways counselor Stephanie Costello, LPC, to work on issues related to plaintiff's PTSD. (Tr. 992, 994, 990, 934, 952, 919, 906). At the same time, plaintiff received frequent home- and community-based services from Pathways community support specialists to work on strategies to cope with past trauma and increase self-esteem. In the course of this work, the community support providers also addressed plaintiff's reports of a suspected stalker and her conflict with — and physical confrontations of — her uncle, in which she was generally the aggressor. (See, e.g., Tr. 1009, 1005, 991, 982, 978, 975, 972, 969, 967, 965, 963, 961, 958, 953, 950, 943, 926).

### 3. Opinion evidence

On June 6, 2014, State agency consultant Elissa Lewis, Ph.D., completed a Psychiatric Review Technique form based on a review of the record. (Tr. 91-97). Dr. Lewis concluded that plaintiff had medically determinable impairments in the categories of 12.02 (organic mental disorders, 12.04 (affective disorders) and 12.06 (anxiety-related disorders). Dr. Lewis found that plaintiff had mild restriction in the activities of daily living and had moderate difficulties in maintaining social functioning and maintaining concentration, persistence and pace. She had no repeated episodes of decompensation of extended duration. The ALJ gave substantial weight to Dr. Lewis's opinion. (Tr. 24).

The record contains a medical source statement dated February 19, 2016, completed by someone at Pathways Community whose illegible signature appears on the document. (Tr. 1021-22). According to the statement, plaintiff was extremely limited in her abilities to function in each of eight areas of work-related activities. A written comment states that plaintiff "continues to have some mood [illegible] and suicide thoughts. She has been in [illegible] hospitalization with some mood instability." The ALJ gave no weight to this medical source statement. (Tr. 24).

On March 2, 2016, Dr. Dumor stated that, "[D]ue to her multiple psychiatric co-morbidities in my professional opinion [plaintiff] is unable to handle the stress and rigors associated with regular employment and the interactions that go on in the workplace. She cannot function in a normal work environment due to these conditions." (Tr. 1027). The ALJ gave this opinion little weight. (Tr. 24).

### III. Standard of Review and Legal Framework

To be eligible for disability benefits, plaintiff must prove that she is disabled under the Act. See Baker v. Sec'y of Health and Human Servs., 955 F.2d 552, 555 (8th Cir. 1992); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Act defines a disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c (a)(3)(A). A claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in

any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Social Security Administration has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009). Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009); see also Bowen, 482 U.S. at 140-42 (explaining the five-step process). If the claimant does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five. Pate-Fires, 564 F.3d at 942. "Prior to step four, the ALJ must assess the claimant's residual functional capacity (RFC), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005). If the ALJ holds at step four that a claimant cannot return to past relevant work, the burden shifts at step five to the Administration to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001); see also 20 C.F.R. § 404.1520(f).

The Court's role on judicial review is to determine whether the ALJ's finding are supported by substantial evidence in the record as a whole. Pate-Fires, 564 F.3d at 942.

13

Substantial evidence is "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Juszczyk v. Astrue, 542 F.3d 626, 631 (8th Cir. 2008); see also Wildman v. Astrue, 964 F.3d 959, 965 (8th Cir. 2010) (same). In determining whether the evidence is substantial, the Court considers evidence that both supports and detracts from the ALJ's decision. Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007).

The Eighth Circuit has repeatedly emphasized that a district court's review of an ALJ's disability determination is intended to be narrow and that courts should "defer heavily to the findings and conclusions of the Social Security Administration." Hurd v. Astrue, 621 F.3d 734, 738 (8th Cir. 2010) (quoting Howard v. Massanari, 255 F.3d 577, 581 (8th Cir. 2001)). Despite this deferential stance, a district court's review must be "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The district court must "also take into account whatever in the record fairly detracts from that decision." Id.; see also Stewart v. Sec'y of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (setting forth factors the court must consider). Finally, a reviewing court should not disturb the ALJ's decision unless it falls outside the available "zone of choice" defined by the evidence of record. Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011). A decision does not fall outside that zone simply because the reviewing court might have reached a different conclusion had it been the finder of fact in the first instance. Id.; see also McNamara v. Astrue, 590 F.3d 607, 610 (8th Cir. 2010) (explaining that if substantial evidence supports the Commissioner's decision, the court "may not reverse, even if inconsistent conclusions may be drawn from the evidence, and [the court] may have reached a different outcome").

## IV. The ALJ's Decision

The ALJ's decision in this matter conforms to the five-step process outlined above. The ALJ found that plaintiff had not engaged in substantial gainful activity since March 26, 2014, the application date. (Tr. 18). At steps two and three, the ALJ found that plaintiff had severe impairments of obesity, asthma, a learning disorder, an affective disorder (variously diagnosed as major depressive disorder and bipolar disorder), an anxiety disorder (variously diagnosed as anxiety, PTSD, and panic disorder with agoraphobia), and borderline personality disorder.[9] Id. The ALJ also determined that plaintiff had several nonsevere impairments. Plaintiff had been diagnosed with irritable bowel syndrome and constipation, but treatment notes established that she experienced significant improvement in her bowel patterns with medication. Id. Plaintiff's testimony that she had severe, frequent headaches was not consistent with the treatment records, neurological examinations, and her treatment with ibuprofen. Id. at 18-19. The ALJ also found that plaintiff's urinary incontinence was nonsevere. Although she had been diagnosed with pelvic floor atrophy and severe levator ani spasm in April 2015, there were no further complaints of urinary incontinence after May 2015 and, in August 2015, she denied any urinary problems during an examination. The ALJ also noted that plaintiff did not follow through on the referral for pelvic floor therapy because she could not afford it. Finally, the ALJ made note that she did not take any medication for incontinence. (Tr. 19). The Court notes that there is no indication in

---

[9] The ALJ determined that plaintiff's obesity and asthma did not satisfy listing requirements. The ALJ also found that plaintiff's mental impairments did not meet the listing criteria, whether considered singly or in combination. Id. at 20. For the purposes of considering the paragraph B criteria for mental impairments, the ALJ found that plaintiff had no restrictions in her activities of daily living; moderate difficulties in social functioning; and moderate difficulties in maintaining concentration, persistence, and pace. Id. at 20-21. And, although plaintiff had three prior psychiatric admissions, they were not of extended duration. Id.

the medical record that any provider prescribed medication or that medication would have been effective to treat her form of incontinence.

The ALJ next determined that plaintiff had the RFC to perform light work and was able to lift 20 pounds occasionally and 10 pounds frequently; was able to stand and or walk a cumulative total of six hours in an eight-hour workday and sit a cumulative total of six hours in an eight-hour workday; was to avoid concentrated exposure to environmental hazards; and was limited to simple, routine work in an environment that is isolated from the public and requires only occasional interaction with coworkers and supervisors and not more than simple reading and math skills. (Tr. 21-22).

In assessing plaintiff's RFC, the ALJ summarized the medical record and opinion evidence, as well as plaintiff's own statements regarding her abilities, conditions, and activities of daily living. While the ALJ found that plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ also determined that plaintiff's statements regarding their intensity, persistence and limiting effect were "not entirely consistent with the medical evidence and other evidence in the record." (Tr. 22-23). The ALJ considered in some detail the limiting effects of plaintiff's obstructive lung defect, obesity, cognitive impairments, and mental impairments. (Tr. 23-24). With respect to plaintiff's mental impairments, the ALJ noted that plaintiff had not required aggressive mental health treatment or frequent psychiatric hospitalization, her condition improved when she was compliant with her medication regimen, her mental status examinations were normal, and she had had only one session of individual counseling. The Court's review of the record shows that plaintiff actually had seven sessions of individual counseling. (Tr. 994, 992, 990, 952, 934, 919, 906).

At step four, the ALJ noted that plaintiff did not have any past relevant work. (Tr. 26). Her age placed her in the "younger individual" category on the application date. She had at least a high school education and was able to communicate in English. Id. Transferability of job skills was not an issue because she did not have any past relevant work. Based on the vocational expert's testimony, the ALJ found at step five that someone with plaintiff's age, education, and functional limitations could perform other work that existed in substantial numbers in the national economy, namely as a garment sorter and bakery line worker. (Tr. 27). Thus, the ALJ found that plaintiff was not disabled within the meaning of the Social Security Act, since March 26, 2014, through the date of the decision on June 27, 2016. Id.

## V. Discussion

Plaintiff asserts that the ALJ failed to properly weigh the opinion of her treating physician, Dr. Dumor. The Court finds that the ALJ's treatment of opinion evidence requires remand of this matter, although on a different basis than the one plaintiff argues here.

The ALJ found that plaintiff suffered from serious mental impairments and included some limitations in the RFC based on those impairments. Because a "claimant's residual functional capacity is a medical question, . . . some medical evidence" must support the determination of the claimant's RFC. Lauer v. Apfel, 245 F.3d 700, 703–04 (8th Cir. 2001) (citations omitted). Generally, social security hearings are non-adversarial and an ALJ bears a responsibility to "develop the record fairly and fully, independent of the claimant's burden to press his case." Cox v. Astrue, 495 F.3d 614, 618 (8th Cir. 2007) (quoting Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004)). Thus, an ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace. Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

17

The record here contains three medical opinions relevant to plainitiff's mental impairments: The June 6, 2014 opinion of Dr. Lewis, a nonexamining state agency psychologist, to which the ALJ gave substantial weight; the February 9, 2016 checklist opinion from someone at Pathways Community Health whose signature cannot be deciphered, to which the ALJ gave no weight; and Dr. Dumor's March 2, 2016 opinion, to which the ALJ gave little weight.

The Court cannot say that the ALJ erred in giving little weight to the Pathways opinion because it consisted of a checklist with no citation to medical evidence. See Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) ("The checklist format, generality, and incompleteness of the assessments limit [the assessments'] evidentiary value.") (citation omitted). With respect to the opinion of Dr. Dumor, the opinion of a treating physician is normally entitled to controlling weight, if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Papesh v. Colvin, 786 F.3d 1126, 1132 (8th Cir. 2015) (quoting Wagner v. Astrue, 499 F.3d 842, 848–49 (8th Cir. 2007)). Here, however, Dr. Dumor specifically deferred treatment of plaintiff's psychiatric issues to Dr. Gowda. (Tr. 776). Thus, the ALJ did not err in failing to give his opinion regarding plaintiff's mental limitations controlling weight.

Turning to the opinion of Dr. Lewis, "the opinions of nonexamining sources are generally . . . given less weight than those of examining sources." Willcockson v. Astrue, 540 F.3d 878, 880 (8th Cir. 2008) (citing 20 C.F.R. § 404.1527(d)(1)). When evaluating a nonexamining source's opinion, the ALJ "evaluate[s] the degree to which these opinions consider all of the pertinent evidence in [the] claim, including opinions of treating and other examining sources." Id. (citing 20 C.F.R. § 404.1527(d)(3) and § 404.1527(f)). The opinion of a nonexamining consulting physician is afforded less weight if the consulting physician did not have access to

18

relevant medical records, including relevant medical records made after the date of evaluation. McCoy v. Astrue, 648 F.3d 605, 616 (8th Cir. 2011). Here, the state agency psychologist did not have access to Dr. Gowda's treatment notes, the records from plaintiff's November 2015 hospitalization, or the extensive observations made during plaintiff's numerous community-based services.[10] Thus, the ALJ erred in relying on Dr. Lewis's opinion to determine the plaintiff's RFC based on mental impairments.

In this case, the ALJ was required to address the degree to which plaintiff's mental impairments affect her RFC. The professional opinions contained in the record were not sufficient to make the necessary determination and the ALJ was required to develop the record.

\* \* \* \* \*

For the foregoing reasons, the Court finds that the ALJ's determination is not supported by substantial evidence on the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and this matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.

A separate Judgment shall accompany this Memorandum and Order.

/s/ ***John M. Bodenhausen***
JOHN M. BODENHAUSEN
UNITED STATES MAGISTRATE JUDGE

Dated this 31st day of August, 2018.

---

[10] Information from the community-support specialists "cannot establish the existence of a medically determinable impairment," but this information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." Sloan v. Astrue, 499 F.3d 883, 888 (8th Cir. 2007) (citing Social Security Ruling, SSR 06-03p, 2006 WL 2263437).